IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DEREK M. BAILEY, | } | |
| TDCJ-CID NO.689542, | } | |
|      Plaintiff, | } | |
| | } | |
| v. | } | CIVIL ACTION G-07-336 |
| | } | |
| BRAD LIVINGSTON., *et al.*, | } | |
|      Defendants. | } | |

<u>OPINION ON DISMISSAL</u>

Plaintiff Derek M. Bailey, an inmate incarcerated in the Texas Department of Criminal Justice-Correctional Institutions Division ("TDCJ-CID") proceeding *pro se* and *in forma pauperis*, has filed a civil rights complaint pursuant to 42 U.S.C. § 1983 and a more definite statement of his claims.  (Docket Entries No.1, No.11).  Plaintiff seeks compensatory, nominal, and punitive damages, and an order directing that all of his health care be provided at the Veteran's Administration Hospital.  (Docket Entry No.1).  Plaintiff has also requests the appointment of counsel.  (Docket Entries No.11, No.18).

Defendants Brad Livingston, Allen Hightower, Sandra Donaho, Natasha T. Dumas, Julia R. Ward, Cathy Frayer-Herzog,[1] Kelly Guidry, Vickie Casiano, Lee Jones, and Jan Slovacek have filed a motion for summary judgment.[2]  (Docket Entry No.25).  The Court will grant defendants' motion for summary judgment and dismiss this action for the reasons to follow.

---

[1] Defendant Frayer has answered by the name Cathy Frayer-Herzog.  Therefore, all references to defendant Frayer will be addressed as Frayer-Herzog.

[2] Defendants N/F/N Hardon, and Lt. Mieken have not been served with process and therefore, have not filed an answer or dispositive motion.  The Assistant Attorney General reports that the Office of the Attorney General has been unable to identify and locate these defendants.  (Docket Entry No.25).

I. BACKGROUND

Plaintiff, a Gulf War veteran, reports that he is legally blind[3] and that he suffers from numerous medical problems including severe hemorrhoids, incontinence, diarrhea, a somatoform disorder, moderate stenosis in most of his neck vertebrae, spondylosis, neuroma, a staph infection, and a broken knuckle on his left foot.  (Docket Entry No.1).  Plaintiff reports that the following events gave rise to the pending complaint:

In 2005, when plaintiff was first transferred to the Ramsey I Unit of TDCJ-CID, defendant Kelly Guidry retaliated against him by assigning plaintiff to work on the hoe squad even though plaintiff's prior heart condition prohibited such assignment.  From November 15, 2005, through October 3, 2006, medical providers were deliberately indifferent to plaintiff's sick call requests regarding a hernia, his heart, his right foot and ankle, his legs, headaches, lumps, hemorrhoids, abdominal pain, and vomiting.  In May 2006, Nurse Lee Jones, Correctional Officer Hardon, and Lt. Mieken delayed treatment for a staph infection on his leg.  On May 18, 2006, Nurse Vickie Casiano saw plaintiff pass out from a high fever but refused to assist him; instead, she told him to submit a sick call request.  In mid-July, 2006, plaintiff was exposed to crop-dusting chemicals and denied medical care for the same.

On November 11, 2006, Sandra Donaho failed to protect plaintiff from an assault by another inmate.  During questioning by security personnel, plaintiff suffered chest pains and was taken to the infirmary, where he became non-responsive.  He was then transported to the University of Texas Medical Branch ("UTMB"), where Dr. Trahan diagnosed him with a lost

---

[3] Plaintiff reports that in 1994, while he was in county jail, his eyes were stabbed with pencils or pens that required eight hours of reconstructive surgery and resulted in true diplopia (double vision) in both eyes and major field of vision loss.  (Docket Entry No.1).  Plaintiff indicates that following this assault, he received psychiatric treatment.  (*Id.*).

sphincter.   While at the hospital, plaintiff was referred to a psychiatrist but defendant Brad Livingston ordered that he be discharged before the psychiatric examination.

In 2007, Donaho, Dumas, Ward, Frayer-Herzog, and Slovacek physically tortured plaintiff by failing to provide adequate medical treatment for his incontinence and hemorrhoids, thereby, forcing him to wear soiled and stained clothing.   They also retaliated against him because he complained about a correctional officer's actions.   Dr. Dumas retaliated against him by refusing to treat him for neuroma, a broken knuckle, stenosis, and spondylosis and by refusing to order a neck brace and medical boots.   (*Id.*).

Defendants move for summary judgment on grounds that they are entitled to Eleventh Amendment immunity and qualified immunity.   (Docket Entry No.25).

## II. MOTION TO APPOINT COUNSEL

Plaintiff seeks the appointment of counsel because of his mental infirmities and the complexity of the case.   (Docket Entries No.11, No.18).

A civil rights complainant has no right to the automatic appointment of counsel. *Branch v. Cole*, 686 F.2d 264 (5th Cir. 1982) (per curiam).   A district court is not required to appoint counsel for an indigent plaintiff asserting a claim under 42 U.S.C. s 1983 unless the case presents exceptional circumstances.   *Id.* at 266.   A district court has the discretion to appoint counsel if doing so would advance the proper administration of justice.   28 U.S.C. § 1915(d); *Ulmer v. Chancellor*, 691 F.2d 209, 213 (5th Cir. 1982).

The Court considers a number of factors in determining whether to appoint counsel, including the following:   (1) the type and complexity of the case; (2) whether the indigent was capable of presenting his case adequately; (3) whether the indigent was in a position to investigate the case; and (4) whether the evidence would consist in large part of

conflicting testimony so as to require skill in the presentation of evidence and in cross examination. *Id.* The Court finds, in this case, that plaintiff's complaint is not particularly complex and plaintiff has proven capable of self-representation. His pleadings adequately advance his claims and the evidence will largely consist of plaintiff's grievances and medical records.

Accordingly, plaintiff's motions for the appointment of counsel (Docket Entries No.11, No.18) are DENIED.

### III. STANDARD OF REVIEW

To be entitled to summary judgment, the pleadings and summary judgment evidence must show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The moving party bears the burden of initially pointing out to the court the basis of the motion and identifying the portions of the record demonstrating the absence of a genuine issue for trial. *Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276 (5th Cir. 1992). Thereafter, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Seque Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)). The Court may grant summary judgment on any ground supported by the record, even if the ground is not raised by the movant. *U.S. v. Houston Pipeline Co.*, 37 F.3d 224, 227 (5th Cir. 1994).

### IV. DISCUSSION

The Civil Rights Act of 1866 creates a private right of action for redressing the violation of federal law by those acting under color of state law. 42 U.S.C. § 1983; *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 82 (1984). Section 1983 is not itself a source

4

of substantive rights but merely provides a method for vindicating federal rights conferred elsewhere. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). To prevail on a section 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United States. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). A section 1983 complainant must support his claim with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations. *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995). Thus for plaintiff to recover, he must show that the defendants deprived him a right guaranteed by the Constitution or the laws of the United States. *See Daniels v. Williams*, 474 U.S. 327, 329-31 (1986).

A. Eleventh Amendment Immunity

Suits for damages against the state are barred by the Eleventh Amendment. *Kentucky v. Graham,* 473 U.S. 159, 169 (1985). Under the Eleventh Amendment, an unconsenting state is immune from suits brought in federal courts by her own citizens as well as by citizens of another state. *Edelman v. Jordan,* 415 U.S. 651, 663 (1974). Absent waiver, neither a state nor agencies acting under its control are subject to suit in federal court. *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144 (1993). This bar remains in effect when state officials are sued for damages in their official capacity. *Cory v. White,* 457 U.S. 85, 89 (1982).

All defendants in this case are either employees of the State of Texas or state agencies; therefore, plaintiff's claims against all defendants in their official capacities are barred by the Eleventh Amendment. *See Will v. Michigan Dept of State Police*, 491 U.S. 58, 71 (1989) (suit not against official but state office); *Oliver v. Scott*, 276 F.3d 736, 742, 742 n. 5 (5th Cir.

2002).   Accordingly, to the extent that plaintiff seeks monetary damages on claims against defendants in their official capacities; plaintiff's claims are barred by the Eleventh Amendment.

## B. Qualified Immunity

Defendants move for summary judgment on the ground that they are entitled to qualified immunity.  (Docket Entry No.25).   Qualified immunity shields government officials performing discretionary functions "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).   "Qualified immunity 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Courts apply a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity.  First, the court determines, "whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights," and, "[i]f so, [the court] next considers whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007) (citations omitted).   The court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available . . . and the law that was clearly established at the time. *Id.* at 411.

When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002).

6

1. Failure to Protect

Plaintiff claims that on November 11, 2006, he was "slammed" by another inmate, causing him to hit the floor and a steel bunk.  (Docket Entry No.11).  Plaintiff claims the inmate then severely beat him about his head and face, and grabbed his genitals.  (*Id.*).  Plaintiff claims no guard was present in the TV area where the assault took place; consequently, he walked to his cubicle after the attack to wait for the guard.  (Docket Entry No.1).  Thereafter, he was questioned by security personnel until he began to suffer chest pains.  (*Id.*).  He was taken to the infirmary and later transported to the University of Texas Medical Branch ("UTMB") in Galveston.  (*Id.*).  He contends that as a result of the assault, he lost control of his sphincter and legs, and suffered near paralysis.  (*Id.*).

Plaintiff maintains that he was subject to the attack because S. Donaho of Correctional Managed Health Care ("CMHC"), and an ophthalmologist at UTMB and failed to provide him with adequate medical care.  (Docket Entry No.1).  Specifically, plaintiff claims that he sought specific restrictions and medical aid because of his blindness and other disabilities from an ophthalmologist at UTMB on July 11, 2006, and from S. Donaho of CMHC by I-60 on September 24, 2006.  (*Id.*).  Plaintiff claims that Donaho responded to the I-60 with a statement that "only a licensed provider can do this.  Please request to be seen and referral to PHOP." (*Id.*).  Plaintiff claims the response was a pretext but states no facts in support of this claim. (*Id.*).  Plaintiff did not attach the sick call request to his complaint and the record does not contain a copy of the same.

The ophthalmologist's notes of July 11, 2006, reflect that plaintiff had continued to complain of diplopia and vision loss from the injury years ago; the physician recommended that plaintiff continue optometry referrals and deferred an MRI to neurology.  (Docket Entry

No.25-7, pages 14-16, 22-23).  The notes do not reflect that eyeglasses or any other treatment was medically indicated or prescribed.

The conditions of a prisoner's confinement and the treatment he receives in prison are subject to scrutiny under the Eighth Amendment.  *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003).  The Eighth Amendment imposes on prison officials a duty to protect prisoners from other inmates.  *Id.*  However, prison officials are not expected to prevent all violence between inmates.  *Id.*  To establish a failure to protect claim, a prisoner must show that he has been incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995).  A prison official cannot be found liable under the Eighth Amendment unless the official knows of and disregards an excessive risk to an inmate's health or safety.  *Adames*, 331 F.3d at 512.  The official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw that inference.  *Farmer*, 511 U.S. at 840-41.  "In other words, in order to be deliberately indifferent, a prison official must be *subjectively aware* of the risk."  *Adames*, 311 at 512 (emphasis in original).  Only deliberate indifference will suffice to state a failure-to-protect claim; mere negligence is not sufficient.  *Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990) (holding that a negligent failure to protect from harm does not make a claim under 42 U.S.C. § 1983).

Plaintiff's factual allegations regarding the actions of Donaho and the UTMB ophthalmologist do not show that they were aware of facts from which an inference could be drawn that plaintiff faced a substantial risk of serious harm from an inmate attack and that they drew such inference.  Furthermore, plaintiff presents nothing to contravene defendants' summary

8

judgment proof that TDCJ has no record that plaintiff filed a life-endangerment claim from August, 2006, to January 15, 2009. (Docket Entry No.25-4, pages 2-3).

Accordingly, defendants are entitled to summary judgment on their qualified immunity defense with respect to this claim.

## 2. Medical Care

Plaintiff also complains that defendants have been subjected him to physical torture and provided inadequate medical care. (Docket Entry No.1).

The Eighth Amendment's prohibition against cruel and unusual punishment forbids deliberate indifference to the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The plaintiff must prove objectively that he was exposed to a substantial risk of serious harm. *Farmer*, 511 U.S. at 834. The plaintiff must also show that prison officials acted or failed to act with deliberate indifference to that risk. *Id.* at 834. The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the prison officials were actually aware of the risk, yet consciously disregarded it. *Id.* at 837, 839; *Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir. 2002). "[F]acts underlying a claim of 'deliberate indifference' must clearly evince the medical need in question and the alleged official dereliction." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). "The legal conclusion of 'deliberate indifference,' therefore, must rest on facts clearly evincing 'wanton' actions on the part of the defendants." *Id.* Mere negligence does not constitute a section 1983 cause of action. *Estelle*, 429 U.S. at 106; *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000) ("the subjective intent to cause harm cannot be inferred from a ... failure to act reasonably").

Deliberate indifference to serious medical needs may be manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or

delaying access to medical care or intentionally interfering with the treatment once prescribed. *Estelle*, 429 U.S. at 104-05.  Delay in obtaining medical treatment does not constitute deliberate indifference unless it is shown that the delay resulted in substantial harm.  *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

<u>a. Physical Torture</u>

Plaintiff claims that "his welfare is in imminent danger by defendants' refusal/interference to provide treatment for complications" from the loss of sphincter function, resulting from the November 11, 2006 altercation.  (Docket Entry No.1).  Plaintiff complains that he is forced to wear feces-soaked clothes for hours and feces-stained clothing after a shower.  In his "Imminent Danger Time Line," plaintiff documents the alleged torture as follows:

In the summer of 2006, plaintiff requested a donut for his hemorrhoids and Nurse Frayer-Herzog issued one to him.  (*Id.*).  On November 11, 2006, plaintiff was transported to UTMB for treatment following the inmate assault; Dr. Trahan diagnosed him with a lost sphincter.  (*Id.*).  Plaintiff was discharged on November 15, 2006, with orders to "get this inmate up and walking" and no others.  (*Id.*).

On May 14, 2007, plaintiff requested and was seen by Nurse Slovacek about diarrhea and soiling; days later he submitted another sick call request for soiling and diapers. (*Id.*).  He was advised to follow the treatment plan initiated by Slovacek.  (*Id.*).  The next day, May 22, 2007, plaintiff complained by I-60 to Medical Administrator Donaho that he had not seen Slovacek about incontinence, but for diarrhea; consequently, there was no treatment plan. (*Id.*).  He was told to schedule an appointment.  (*Id.*).

On May 25, 2007, plaintiff saw Frayer-Herzog and Dr. Ward for incontinence, hemorrhoids, and a medical blanket.  (*Id.*).  An order was given to document soiling.  (*Id.*).

Plaintiff found it embarrassing and humiliating to use washcloths as diapers. Frayer-Herzog denied him a donut for his hemorrhoids and the medical blanket. (*Id*.).

On May 26, 2007, plaintiff complained by I-60 to Donaho that Frayer-Herzog had denied him a donut for his hemorrhoids and a medical blanket. (*Id*.). He was informed that an appointment had been scheduled with Dr. Dumas. (*Id.*).

On May 28, 2007, Officer V.D. Austin tried to circumvent the May 25, 2007 order issued by Frayer-Herzog to document soiling in the infirmary. (*Id*.). On May 30, 2007, plaintiff submitted an I-60 to Donaho and Warden Negbenebor about Austin's actions. In a response dated May 31, 2007, plaintiff was informed that Frayer-Herzog was unaware of a policy change. (*Id*.). Plaintiff was instructed to present himself to guards if he should soil himself and that the guards would direct him to the shower and clean clothes. (*Id*.).

On May 31, 2007, Dr. Dumas saw plaintiff for complaints regarding the hemorrhoids, the donut, and blanket; she did not perform an examination for internal canal hemorrhoids or rectal sphincter. (*Id*.). Dumas ordered creams for the hemorrhoids but refused to issue the donut and blanket. (*Id*.).

On June 5, 2007, plaintiff submitted a sick call to verify that Frayer-Herzog and Dr. Ward had referred him to UTMB for treatment of his incontinence problems. (*Id*.). Slovacek reported that there had been no referral per chart review on June 6, 2007. (*Id*.). Plaintiff also submitted an I-60 to the Warden requesting to be transported to the VA Hospital due to Unit providers' refusal to treat his incontinence; plaintiff was advised to address the issue with the medical provider. (*Id*.).

On June 7, 2007, plaintiff submitted another sick call request to which Slovacek replied that plaintiff had been seen by Dr. Dumas for this issue and that he should follow the

treatment plan.  (*Id.*).  The same day, plaintiff submitted another sick call request to Donaho, requesting to be seen by a specialist for incontinence.  He was informed in response that Dr. Dumas had noted that plaintiff had no sphincter loss but good tone on examination.  (*Id.*).  On June 9, 2007, plaintiff questioned the treatment plan in another sick call request, to which he was informed by Slovacek that he had been seen by Dr. Dumas who found no indication of incontinence.  (*Id.*).  In response to another I-60 on June 13, 2007, Dr. Ward replied that Dr. Dumas had seen plaintiff on May 31, 2007.  (*Id.*).  Thereafter, plaintiff filed a grievance and a letter to this Court and the VA.  (*Id.*).

Defendants' uncontroverted summary judgment record reflects that plaintiff was reported to have suffered incontinence or loss of sphincter function on the day of the assault in November, 2006.  After he was allegedly attacked by another inmate, plaintiff was seen in the Ramsey Unit Clinic by LVN Bradley-Wessel, who prescribed pain medication for plaintiff's complaint of a headache and ordered that he be transported by van to UTMB in Galveston. (Docket Entry No.25-8, page 16).  Within a couple of hours, plaintiff became unresponsive and local emergency medical personnel ("EMS") were called.  (*Id.*, page 17).  Shortly thereafter, arrangements were made to life-flight plaintiff to UTMB by helicopter.  (*Id.*, page 18).  EMS reported to UTMB personnel that plaintiff would not respond verbally and that he had a loss of bladder function.  (Docket Entries No.25-8, page 23; No.25-10, page 20).  UTMB's Trauma Services, however, noted in its initial history and physical assessment on November 12, 2006, that plaintiff had a loss of rectal sphincter.  (Docket Entry No.25-11, page 1).

Plaintiff was evaluated by medical specialists at UTMB for four days.  (Docket Entries No.25-9, pages 3-25; No.25-10, pages 1, 3-9, 23-25, No.25-11, pages 1-5, 7-13). Thereafter, on November 16, 2006, plaintiff was discharged to a skilled nursing facility at the

12

Beto Unit.[4]   (Docket Entries No.25-10, page 20, No.25-22, page 2).   UTMB's Dr. Ryan noted

plaintiff's medical condition in his request for plaintiff's placement in the Beto Infirmary, as

follows, in pertinent part:

> Pt with no bruising to any part of his body except his face.  He has 2 black
> eyes, the left is worse th[an] the right, RT eye with mild edema, Left with
> moderate edema, but is able to see from both eyes (nei[t]her one swollen
> shut).  Pt is able to move all extremities very well in bed and is able to get
> himself on and off the bed pan, but states he cannot walk.  PT has been up
> X2 days trying to get him up and he cannot bear weight (suspect
> malingering).  Pt acted as if he could not speak when he originally came
> in, but when he found out he would not eat, he was then able to talk.

(Docket Entry No.25-10, page 10).   The notes further indicate that petitioner was toileting

himself and using the bedpan or urinal and he was not using diapers.  (*Id.*).  He was diagnosed

with post concussion syndrome.  (*Id.*, page 22).

On November 16, 2006, plaintiff's medical condition was assessed by staff at the

Beto I Unit's Infirmary.  No urinary or rectal sphincter issues were noted.  (Docket Entry No.25-

11, page 6).  Plaintiff reported no problems with his sphincter to intake personnel.  (*Id.*, pages

14-16).  In fact, throughout his stay at the Beto I Infirmary, plaintiff did not report and medical

providers did not record that plaintiff had any problems with incontinence or his rectal

sphincter.[5]  (Docket Entries No.25-11, No.25-12, No.25-13, No.25-14, No.25-15, No.25-16,

No.25-17, No.25-18, pages 1-12).

---

[4] The Discharge Summary reflects that plaintiff had an MRI of the head, neck, brain, cervical, lumbar, and thoracic spines, all of which showed no acute pathology or changes.  (Docket Entry No.25-10, page 20).  He also had physical therapy during his hospitalization.  He had full use of his upper and lower extremities but he was unable to walk.  (*Id.*).

[5] The summary of his infirmary stay dated February 15, 2007, reflects the following findings, in pertinent part:

> Derek Bailey was involved in an altercation with other offenders 11/11/2007 [sic] and
> was admitted to Beto Infirmary with a presumptive diagnosis of post concussion, spinal
> cord shock, and paraplegia of unknown etiology.  After MRI and complete evaluation @
> HG it was found that patient was without physical findings to substantiate his claim that

Plaintiff returned to the Ramsey Unit on February 21, 2007. (Docket Entry No.25-18, page 14). Plaintiff's medical record reflects that once there, he saw medical personnel numerous times for a variety of issues. With respect to his claims of physical torture for want of care for his hemorrhoids and sphincter loss, plaintiff records show that in June, 2006, before the November 2006 assault, plaintiff was diagnosed with hemorrhoid 2nd degree and medication was prescribed. (Docket Entry No.25-7, page 3). On June 20, 2006, he was diagnosed by Frayer-Herzog with a new onset of hemorrhoids. (*Id.*, page 10). She issued a donut pass for ninety days. (*Id.*). On August 10, 2006, defendant Dr. Dumas noted no inflamed hemorrhoids and determined that a donut was not medically indicated. (Docket Entry No.25-8, page 2).

After the assault in November, 2006, plaintiff was not seen by medical personnel about hemorrhoids or other rectal problems until May 14, 2007, when he was seen by Dr. Ward and Slovacek for diarrhea. (Docket Entry No.25-19, page 6). A stool sample was ordered on plaintiff's complaint of loss of bowel function after assault. (*Id.*). The sample results were within normal limits. (*Id.*, pages 7-8).

---

he was unable to stand or walk. He had no evidence of sustaining any type of injury and all images from RI were totally benign, negative for any kind of pathology.

Throughout his infirmity stay patient repeatedly refused physical therapy and said, "All of my problems are psychological and there is nothing you can do about it." He expressed fears of being released from the infirmary and of being hurt by other offenders again. Physical therapy was discontinued due to his lack of cooperation and refusal to participate. Patient was evaluated by psych and determined to have probable somatoform disorder. After the order for a wheelchair was discontinued the patient threw a BP cuff at Nancy Betts LVN. Two days later he began walking with a walker without difficulty. His only positive findings are HTN and minor weakness of his right LE as compared to his left most likely secondary to slight c-spine stenosis. After he began walking patient said, "Thank you for making me get out of the wheelchair, I just needed a kick in the butt." Patient was without CP during his 2-month infirmary stay and no evidence for a diagnosis of CAD was found. Patient was discharged in good condition.

(Docket Entry No.25-18, page 11).

On May 23, 2007, plaintiff reported during an outpatient clinical interview with a mental health provider that he was "still having pain and medical problems from [the November 2006 assault] . . . that due to nerve damage, he has poor control of his sphincter, and has anal leakage at times, causing him embarrassment."  (*Id.*, page 10).

On May 25, 2007, Dr. Ward and Frayer-Herzog examined plaintiff regarding his request for diapers to aid him with his dysfunctional sphincter.  (*Id.*, page 11).  Plaintiff reported that since the November 2006 assault "he has not had good anal sphincter tone and that he frequently soils himself."  (*Id.*).   Plaintiff also reported that he lines his underwear with washcloths purchased from the commissary and disposes of them when soiled.  (*Id.*).  Plaintiff requested adult diapers, a blanket, and an inflatable donut for hemorrhoids.  (*Id.*).  Ward and Frayer-Herzog performed a rectal examination and determined that plaintiff's rectal sphincter tone was normal.  (*Id.*).  They noted three "very small hemorrhoids."  (*Id.*).  Plaintiff's requests were denied because diapers, a blanket, and a donut were not medically indicated.  (*Id.*).  Plaintiff was ordered to discontinue lining his underwear with washcloths and to come to the clinic for a yellow bag and change of clothing when soiled.  (*Id.*).  Medical personnel were to document such action.  (*Id.*).

The same day, plaintiff came to the clinic for a soiled clothing check.  (*Id.*, page 12).  Minor streaking was noted on the undershorts only; no major fecal material was noted.  (*Id.*).  He was seen again on May 28th and 31st and a small amount of fecal material was noted.  (*Id.*, pages 13-14).

On May 31st, Frayer-Herzog entered an addendum to the May 25th clinic note in response to complaint that yellow bags were no longer issued by security personnel in the clinic and a change of clothing was not available in the clinic.  (*Id.*, page 15).  A new order was entered

which required plaintiff to notify security when soiled and security personnel would send him for a shower and clean clothes.  (*Id.*).

On the same day, Dr. Dumas re-examined plaintiff and found three non-inflamed external hemorrhoids and no anal sphincter loss.  (*Id.*, page 16).  She noted "good tone on exam." (*Id.*).

Plaintiff filed the pending suit on June 26, 2007.  He failed to attend a scheduled appointment regarding soiling on June 27, 2007.  (*Id.*, page 17).  On June 29, 2007, plaintiff saw a mental health provider upon Dr. Ward's referral.  (*Id.*, page 19).  Plaintiff reported that he had problems with anal leakage due to a sexual assault in November, 2006 and that he doesn't believe the doctors' findings with respect to his problems.  (*Id.*).  Plaintiff was referred for further mental health treatment.  (*Id.*).

Plaintiff last reported "inner" sphincter loss to Dr. Ward on July 3, 2007.  (*Id.*, page 21).

Plaintiff's own account of his medical history and his medical records do not support a claim of physical torture or deliberate indifference to plaintiff's serious medical needs. Plaintiff's medical records reflect that medical personnel were responsive to his complaint of loss of bowel control and they did not authorize the diapers, blanket, or donut that plaintiff requested because they were not medically indicated.  Plaintiff's dissatisfaction with the medical treatment he received does not mean that he suffered deliberate indifference.  *See e.g., Norton v. Dimazana*, 122 F.3d 286, 291-92 (5th Cir. 1997); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (holding inmate's "disagreement with his medical treatment" not sufficient to show Eighth Amendment violation); *Fielder v. Bosshard*, 590 F.2d 105, 107 (5th Cir. 1979) (finding

"[m]ere negligence, neglect or medical malpractice is insufficient" to show Eighth Amendment violation).  Plaintiff presents nothing to contravene this record.

Because plaintiff has not shown a genuine issue of material fact on his Eighth Amendment "torture" claim, defendants are entitled to qualified immunity.

<u>b. Deliberate Indifference</u>

Plaintiff also claims that defendants have been deliberately indifferent to his serious medical needs.  (Docket Entry No.1).

Plaintiff claims that he has been denied mental health care; specifically, that he is not being treated by CMHC Mental Health for his somatoform disorder and depression and anxiety.  (*Id.*).  Plaintiff contends that he requested to see a psychiatrist while he was being treated at UTMB in 2006, but Brad Livingston refused such examination and ordered him to be transferred to the Beto Unit Infirmary without a psychiatric examination.  (*Id.*).  Plaintiff refers the Court to a letter dated May 7, 2007 to his mother from Brad Livingston but plaintiff did not attach such letter to his pleadings.  (*Id.*).

Plaintiff's medical records reflect that he received psychiatric treatment during his incarceration at the Beto I Infirmary and that he has seen mental health providers at his present unit.  (Docket Entries No. 25-18, page 11, No.25-19, page 10).  Plaintiff states no facts to support his allegations against Livingston and the record reflects no documentation that Livingston was ever personally involved in plaintiff's medical care or in the development of any policy that would impact plaintiff's medical care, including mental health services.  Liability based on supervisory capacity exists only if supervisor is personally involved in constitutional deprivation or a sufficient causal connection exits between the supervisor's wrongful conduct and the constitutional violation.  *See Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987).

17

Plaintiff also complains that from November 15, 2005, to October 3, 2006, he was denied adequate medical care for various ailments for which he submitted a sick call request. (Docket Entry No.1).  He further complains that his medical records were falsified.  Plaintiff's claims are conclusory and therefore, subject to dismissal.

Plaintiff further complains that he was denied treatment for exposure to chemicals used in crop-dusting in July, 2006.  (Docket Entry No.1).  The record shows that plaintiff submitted a sick call request on July 21, 2006, complaining of exposure to the crop-dusting chemicals on July 18, 2006.  (Docket Entry No.1-3, page 31).  Defendant Donaho responded on July 21, 2006, that plaintiff had an appointment with a medical provider, and that he should discuss the exposure at that time.  (*Id*.).  On August 2, 2006, plaintiff submitted a second sick call request to be seen for the effects of the crop dusting exposure on July 18, 2006.  (*Id*., pages 33-34).  He complained that he did not have a scheduled appointment to discuss the effects of the chemical exposure and that he was suffering from a bleeding nose, watery eyes, headaches, rashes, and, jock-itch.  (*Id.*).  Donaho responded that he had an appointment with Dumas.  (*Id.*, page 33).

Plaintiff's medical records show that plaintiff was seen by Frayer-Herzog on July 24, 2006, about a pain in his left lower leg.  (Docket Entry No.25-7, page 19).  He was seen by medical personnel at the UTMB's neurology outpatient clinic on July 27, 2006.  (*Id.*, pages 20-21).  He was also seen by a mental health provider on August 2, 2006.  (*Id.*, page 24).  Medical notes do not show that plaintiff discussed the alleged chemical exposure with any of these providers.  On August 4, 2006, plaintiff was seen by Dr. Dumas, to whom he complained of the following:  His nose had bled on July 18, 2006; since November, 2005, his eyes had watered when he was outside; he suffered from headaches; and, the medication prescribed for jock-itch

18

was no longer effective. (Docket Entry No.25-8, page 1). Dr. Dumas noted no nasal mucous congestion or bleeding or evidence of old bleeding, no watery eyes; she found his headaches were chronic and that he possibly had some allergies and jock itch. (*Id.*). None of these conditions were attributed to chemical exposure from crop-dusting.

The response to plaintiff's Step 2 Grievance No. 2006204108, wherein he complained about the exposure to crop-dusting chemicals, also shows that plaintiff's claims were not ignored by TDCJ officials. Plaintiff was informed, as follows:

> The review of the medical record and discussion with the unit Farm Manager and the TDCJ Entomologist reveal that there is no merit to the claim. The interviews reveal there are procedures that are required by the Texas Department of Agriculture when a person is exposed to the chemicals of a crop dusting on TDCJ units. It is noted that no Sick Calls were received on either 7/18/2006 or 7/19/2006. The health care provider saw you on 7/24/2006 for complaints of leg and knee pain. There is no indication in the record documenting that you addressed the exposure of 7/18/2006 during this encounter. There is no documented receipt of Sick Call Requests complaining of the exposure until 8/3/2006. The provider evaluated you on 8/4/2006 and noted no treatment was indicated for watery eyes or a nose bleed at that time.

(Docket Entry No.1-3, page 38). Plaintiff presents nothing to contravene this record.

A liberal construction of plaintiff's claims against defendants Lt. Mieken, Officer Hardon, and Nurse Jones is that by their actions, plaintiff's treatment for a staph infection was delayed. Plaintiff contends that Lt. Mieken wrongfully accused him of a disciplinary violation when he tried to show Officer Hardon a massive wound on his leg. (Docket Entry No.1). Plaintiff claims that he had to lower his pants to show the wound to Officer Hardon but Hardon complained that plaintiff was exposing himself to her. (*Id.*). Plaintiff complained in Step 1 Grievance No.2006192041, dated July 7, 2006, that on May 18, 2006, Lt. Mieken handcuffed him when plaintiff tried to access health care for a festering staph infection that covered half of his leg. (Docket Entry No.1-4, page 17). In response to the Step 1 Grievance, Warden

19

Turrubiarte indicated that an investigation and review of the disciplinary report and hearing record disclosed no procedural errors and sufficient evidence to justify the hearing officer's findings. (Docket Entry No.1-4, page 18). His Step 2 grievance complaining of retaliation was also denied. (*Id.*, pages 19-20).

Although plaintiff contends that Nurse Jones denied him care for the staph infection, "false records, and abuse," he states no facts in his pleadings to support any claim against Jones. (Docket Entry No.1). Plaintiff, however, alleged in Step One Grievance No.2006158067 that Jones refused proper health care for the staph infection on May 17, 2006. (Docket Entry No.1-4, page 25). Plaintiff claimed that Jones was angry and laughed at him and told him to put a sick call in. (*Id.*). In a response to the grievance dated June 15, 2006, Warden Turrubiarte indicated that plaintiff received treatment and medication for the staph infection and that he should have recovered by now. (*Id.*, page 26). Turrubiarte noted that plaintiff did not show for his infirmary appointment on May 19, 2006, but he had since been evaluated by Dr. Dumas and Frayer-Herzog. (*Id.*).

Defendants' summary judgment evidence reflects that Jones issued plaintiff a medical pass on May 23, 2006, but shows no other documentation of any other encounter between Jones and plaintiff. (Docket Entry No.25-22, page 2). Plaintiff's medical records show that the staph symptoms were first observed on May 19, 2006, and a culture was taken on May 23, 2006. (Docket Entry No.25-7, page 5). The lab results dated June 12, 2006, confirmed that plaintiff had a Methicillin Resistant Staph Aureus ("MSRA") from a minor skin infection on his lower extremity. (*Id.*). In a letter to plaintiff's mother dated June 8, 2006, Investigator Douglas B. King, stated that there was no documentation in the medical record regarding a nursing assessment of plaintiff for a wound complaint. (Docket Entry No.1-4, page 32). King stated that

the plaintiff submitted a sick call request on May 19, 2006 and was evaluated the same day by a UTMB-CMHC provider, who noted that he had a raised nodule without drainage to his left leg. (*Id.*).  He was given an antibiotic and a culture was taken.  (*Id.*).  Plaintiff was last evaluated for this condition on May 30, 2006, by the medical provider and continued on the antibiotic.  (*Id.*).

To the extent that plaintiff claims that the actions of Miekens, Hardon, and Jones delayed plaintiff's treatment for the MSRA, the record does not show that their actions caused him to suffer substantial harm.  *See Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).  Plaintiff's infection was effectively treated within days of his alleged complaint to Jones.  Accordingly, plaintiff's claims against Miekens, Hardon, and Jones are subject to dismissal.

Plaintiff also contends that on May 18, 2006, Nurse Casiano saw plaintiff pass out from a high fever but refused to assist him; instead she told him to submit a sick call request.[6] (Docket Entry No.1).  Defendants' summary judgment evidence shows that Nurse Casiano had three documented encounters with plaintiff, none of which occurred in May, 2006.  (Docket Entry No.25-22, page 2).  On November 10, 2005, Casiano completed the chain-in review of plaintiff's condition and medical history.   On November 15, 2005, she assessed him for complaints of chest pain and a low-grade fever when he came into the infirmary by wheelchair.  She completed an EKG and noted verbal orders from Dr. Dumas to schedule an appointment for the next morning.  Plaintiff did not appear for the November 16, 2005 appointment but came to the clinic on November 21, 2005, complaining of chest pains.  (*Id.*)

---

[6] Investigator King reported in a letter to plaintiff's mother that on November 8, 2005, plaintiff came into the Ramsey I Unit with no documented medical housing or work restrictions on his Health Summary for Classification ("HSM-18").   (Docket Entry No.1-4, page 33).   King stated that on that day, plaintiff was evaluated by an unidentified nurse when notified by security that plaintiff had "passed out."  (*Id.*).  His blood pressure and pulse rate were found to be within normal limits by the nurse and plaintiff denied chest pain.  (*Id.*).  An EKG, given at a later date, was abnormal; consequently, plaintiff's job assignment was changed.  (*Id.*).

Plaintiff presents nothing to contravene this record. Accordingly, his claim against Casiano is subject to dismissal.

Plaintiff further claims he has been denied eye glasses since 2000, even though he has seen the optometrist twelve times in eight months. (*Id.*). Plaintiff does not claim that he has been intentionally denied glasses and he states no facts that would give rise to such a claim. Moreover, he proffers no explanation for the denial of glasses. Nevertheless, the fact that plaintiff acknowledges that he has been seen by an optometrist twelve times in eight months, reflects that plaintiff is receiving some care for his vision problems even though the care is not what plaintiff desires. *See Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (holding inmate's "disagreement with his medical treatment" not sufficient to show Eighth Amendment violation); *Fielder v. Bosshard*, 590 F.2d 105, 107 (5th Cir. 1979) (finding "[m]ere negligence, neglect or medical malpractice is insufficient" to show Eighth Amendment violation).

Plaintiff further complains that in the 1990s, he suffered a ruptured gall bladder[7] and tubercle bacillus[8] when he was incarcerated at the Clements Unit. (*Id.*). These claims are time-barred. *See Burrell v. Newsom*, 883 F.2d 416, 418 (5th Cir. 1989) (holding that in §1983 cases, federal courts apply the forum state's general personal injury limitations); *Pitotrowski v. City of Houston*, 51 F.3d 512, 516 (5th Cir. 1995) (stating that claim accrues when "the plaintiff is in possession of the critical facts that he has been hurt and who has inflicted the injury" or "has reason to know" this information); TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 (Vernon 2002) (establishing two-year tolling period for personal injury claims).

---

[7] Plaintiff was seen by Slovacek on July 30, 2007, regarding pain in the area where his gall bladder was removed in 1997. (Docket Entry No.125-19, page 24).

[8] Plaintiff's mental health services notes reflect that he has TB, Class 2 infection that was first observed in December, 1995. (Docket Entry No.25-20, page 18).

Based on the foregoing, the Court finds no evidence of a material fact issue with respect to plaintiff's claim that defendants have been deliberately indifferent to his serious medical needs; accordingly, defendants are entitled to summary judgment on their qualified immunity defense.

### 3. Retaliation

Plaintiff alleges that some defendants have also retaliated against him.  (Docket Entry No.1).

To state a valid claim for retaliation under section 1983, an inmate must allege more than his personal belief that he was the victim of retaliation.  *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997).  Mere conclusory allegations of retaliation are not enough.  *Moody v. Baker*, 857 F.2d 256, 258 (5th Cir. 1988).  He must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation.  *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir. 1999).  The inmate must allege facts showing that a defendant possessed a retaliatory motive. *See Whittington v. Lynaugh*, 842 F.2d 818, 820 (5th Cir. 1988); *Hilliard v. Board of Pardons and Paroles*, 759 F.2d 1190, 1193 (5th Cir. 1985).  He "must produce direct evidence of motivation or, the more probable scenario, 'allege a chronology of events from which retaliation may plausibly be inferred.'"  *Id.*  (citation omitted).  Moreover, he must show that "but for" a retaliatory motive, the defendants would not have engaged in the action.  *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998).

Plaintiff claims that Dumas, Donaho, Ward, Frayer-Herzog, and Slovacek have retaliated against him for complaining about Officer Austin's refusal to allow plaintiff to access the clinic to show proof of soiling.  Plaintiff contends that their retaliatory acts include denying

that he suffers from anal incontinence, failing to conduct a proper examination, falsifying medical records, and refusing to renew his donut pass and to provide him with a blanket.  (*Id*.).

A prison official may not retaliate against or harass an inmate for complaining through proper channels about a guard's misconduct.  *Woods v. Smith,* 60 F.3d 1161, 1164 (5th Cir. 1995).  The record, however, does not show that Officer Austin engaged in misconduct or that defendants retaliated against plaintiff because he grieved Austin's actions.   The record shows that Nurse Frayer-Herzog entered a medical order to allow plaintiff a change of clothing and to document evidence of his alleged incontinence but she was unaware of a policy change regarding the issuance of clean clothes in the infirmary.  When Officer Austin did not follow the medical order, plaintiff complained by an I-60.  (Docket Entry No.1, page 35).  He was informed that Frayer-Herzog was unaware of the policy change.   (*Id*.).   Frayer-Herzog entered an addendum to her previous order authorizing plaintiff access to clean clothes, a shower, and a yellow bag to document the soiling within policy requirements.  (Docket Entry No.25-19, page 15).  The record does not show, and plaintiff presents no evidence to show, that plaintiff was denied medical care or adequate medical care but for his complaint about Officer Austin.

Plaintiff also claims that the following acts were retaliatory:

1.  Major Kelly A. Guidry assigned him to the hoe squad, even though plaintiff's intake papers showed that he was a psychiatric patient with a heart ailment and suffered numerous other physical ailments. Plaintiff claims he was removed from a federal agricultural program and transferred to the Ramsey 1 Unit and placed in the hoe squad.

2.  Plaintiff was refused treatment for neuroma in his right foot, a broken knuckle on his left, stenosis, and spondylosis; Dr. Dumas has also refused his request for a neck brace and medical boots.

(Docket Entry No.1).  Plaintiff, however, states no facts to show Guidry's or Dumas's intent to retaliate or facts to show that he exercised a constitutional right for which defendants Guidry or

24

Dumas engaged in such retaliation.  In short, neither the pleadings nor the record give rise to a retaliation claim.  Accordingly, plaintiff's retaliation claims are subject to dismissal.

### 4. Personal Involvement

Although plaintiff names as Brad Livingston and Allen Hightower as defendants in this case, he states no facts to show that either Livingston or Hightower were personally involved in any act or omission that forms the basis of the present suit or that they initiated or implemented an unconstitutional policy with respect to the same.  Section 1983 will not support a claim based on *respondeat superior* or vicarious liability.  *Pierce v. Texas Dept. of Criminal Justice-Institutional Div.*, 37 F.3d 1146, 1150 (5th Cir. 1994).  "Personal involvement is an essential element of a civil rights cause of action."  *Thompson v. Steele*, 709 F.2d 381 (5th Cir. 1983).  Each defendant must either actively participate in the acts complained of or implement unconstitutional policies that result in injury.  *Mouille v. City of Live Oak, Texas*, 977 F.2d 924, 929 (5th Cir. 1992).  Plaintiff's claims against Livingston and Hightower are, therefore, subject to dismissal.

### V. CONCLUSION

Based on the foregoing, the Court ORDERS the following:

1.  Plaintiff's motions to appoint counsel (Docket Entries No.11, No.18) are DENIED.

2.  Defendants' motion for summary judgment (Docket Entry No.25) is GRANTED.

3.  All claims against all defendants are DENIED and this complaint is DISMISSED WITH PREJUDICE.  All relief requested is DENIED.

4.  All pending motions are DENIED.

The Clerk of Court will send a copy of this Order to the parties.

SIGNED at Houston, Texas, this 23rd day of July, 2009.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE